IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MEGAN M. STANEK, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SARPY COUNTY, NEBRASKA, a political | ) | |
| subdivision; | ) | |
| | ) | |
| SARPY COUNTY TREASURER, a political | ) | |
| subdivision; | ) | |
| | ) | |
| TRACE JONES, in his official capacity as | ) | |
| interim Sarpy County Treasurer; | ) | |
| | ) | **COMPLAINT AND JURY DEMAND** |
| SARPY COUNTY BOARD OF | ) | |
| COMMISSIONERS; | ) | |
| | ) | |
| SARPY COUNTY PERSONNEL POLICY | ) | |
| BOARD; | ) | |
| | ) | |
| RANDY BENNETT, in his official capacity, | ) | |
| JONATHAN DAVIDSON, in his official | ) | |
| capacity, GEORGE FORST, in his official | ) | |
| capacity JOHN STRAWN, in his official | ) | |
| capacity and LAURA TATTEN, in her | ) | |
| official capacity, | ) | |
| | | |
| Defendants. | | |

COMES NOW the Plaintiff, by and through her attorneys, and for her cause of action

against the Defendants hereby states the following:

**PARTIES-VENUE-JURISDICTION**

1.      Plaintiff MEGAN M. STANEK is a resident of Bellevue, Sarpy County, Nebraska.

2.      At all times relevant, Defendant Sarpy County has continuously been a political

subdivision doing business in the State of Nebraska and in the City of Papillion, Nebraska.

1

3.      At all times relevant, Defendant Sarpy County Treasurer has continuously been a political subdivision doing business in the State of Nebraska and in the City of Papillion, Nebraska. At all relevant times hereto, Brian Zuger ("Zuger"), the former Sarpy County Treasurer, was Plaintiff's supervisor under the elected title of Sarpy County Treasurer. The current Sarpy County Treasurer, Trace Jones, succeeded Zuger and is sued in his official capacity as an employee, agent, or servant of Sarpy County.

4.      At all times relevant, Defendant Sarpy County Board of Commissioners, is an entity existing under the statutes of the State of Nebraska whose members are elected and upon information and belief may have had input related to Plaintiff's disciplinary actions and termination from her employment with Defendant Sarpy County and Defendant Sarpy County Treasurer.

5.      At all times relevant, Defendant Sarpy County Personnel Policy Board, (hereinafter "Board") is an entity existing under the statutes of the State of Nebraska and whose decision denied Plaintiff's appeal of her termination from her employment with Defendant Sarpy County and Defendant Sarpy County Treasurer.

6.      At all times relevant, Randy Bennett, was a member of the Sarpy County Personnel Policy Board, and is named in these proceedings solely in his official capacity as a member of the Sarpy County Personnel Policy Board when Plaintiff was terminated from her employment.

7.      At all times relevant, Jonathan Davidson, was a member of the Sarpy County Personnel Policy Board, and is named in these proceedings solely in his official capacity as a member of the Sarpy County Personnel Policy Board when Plaintiff was terminated from her employment.

8.      At all times relevant, George Forst, was a member of the Sarpy County Personnel

Policy Board, and is named in these proceedings solely in his official capacity as a member of the Sarpy County Personnel Policy Board when Plaintiff was terminated from her employment.

9.      At all times relevant, John Strawn, was a member of the Sarpy County Personnel Policy Board, and is named in these proceedings solely in his official capacity as a member of the Sarpy County Personnel Policy Board when Plaintiff was terminated from her employment.

10.     At all times relevant, Laura Tatten, was a member of the Sarpy County Personnel Policy Board, and is named in these proceedings solely in her official capacity as a member of the Sarpy County Personnel Policy Board when Plaintiff was terminated from her employment.

11.     This Court has original jurisdiction over the claims arising under Federal law and concurrent jurisdiction over the state law claims. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and the Court's pendent claim jurisdiction under 28 U.S.C. §1367(a).

12.     Venue is appropriate in this District under 28 U.S.C. §§1391(b) and (c).

13.     To the extent required by law, Plaintiff sent appropriate notice of her claims to Defendant Sarpy County, Sarpy County Board of Commissioners and Sarpy County Treasurer by certified mail on or about January 5, 2021. On or about November 29, 2021, Plaintiff formally notified Defendant Sarpy County, Sarpy County Board of Commissioners and Sarpy County Treasurer by certified letters of her intention to withdraw her claim and proceed judicially in the appropriate court of law.

14.     On or about July 15, 2020, Plaintiff filed a charge of discrimination with the Nebraska Equal Opportunity Commission ("NEOC") (NEB 1-20/21-7-51438-RS) and the U.S. Equal Opportunity Commission ("EEOC") (32E-2020-00533) claiming pregnancy discrimination and retaliation.

15.     On or about August 31, 2021, less than 90 days prior to the filing of this Complaint,

Nebraska Equal Opportunity Commission ("NEOC") made a determination with respect to Plaintiff's charge, NEB 1-20/21-7-51438-RS.

16.     On or about October 14, 2021, less than 90 days prior to the filing of this Complaint, the U.S. Equal Employment Opportunity Commission issued a Notice of Right to Sue from on charge number 32E-2020-00533.

17.     On or about April 1, 2021, Plaintiff filed another charge of discrimination with the Nebraska Equal Opportunity Commission (NEB 1-20/21-4-51963-RS) and the U.S. Equal Opportunity Commission (EEOC 32E-2021-00308) claiming pregnancy discrimination, disability discrimination and retaliation under both federal and state laws. At the time of filing of this Complaint, the NEOC and EEOC's investigation into Plaintiff's claims under federal and state laws are still pending. As a result, Plaintiff reserves the right and intends to amend this Complaint to include her claims still under administrative review upon receipt of her Right to Sue and/or Determination letter regarding the same.

## FACTUAL BACKGROUND

18.     Plaintiff was employed as a Customer Service Associate by Defendant Sarpy County at Defendant Sarpy County Treasurer's Office in Papillion, Nebraska, from sometime in September 2017 until November 13, 2020.

19.     When Plaintiff was on maternity leave in October 2019, she contacted Defendant Sarpy County's Human Resources Department by telephone regarding her need to have a private room to pump breast milk after she returned to work from maternity leave. Plaintiff was told they would have no issue accommodating her when she returned to work.

20.     When Plaintiff returned to work from maternity leave in December 2019, she was instructed to use an unsecure room to pump breast milk that had three different doors that were

4

used to access the room.

21.     Beginning on January 5, 2020, there were multiple occasions where people walked in on Plaintiff while she was uncovered and utilizing the room to express breast milk for her child.

22.     In January 2020, former Sarpy County Treasurer, Brian Zuger, walked in on Plaintiff while she was uncovered and pumping breast milk. Zuger did not apologize, did not take any steps to get Plaintiff a more secure room and did not take any steps to prevent people from intruding on Plaintiff while she was uncovered and expressing breastmilk on her breaks.

23.     In January 2020, Plaintiff was given a performance review stating that her customer service and professionalism exceed expectations.

24.     In early February 2020, one of the Sarpy County sheriffs unlocked one of the three doors to Plaintiff's pumping room with a key and walked into the room while Plaintiff was uncovered and pumping breast milk.

25.     After the sheriff incident, Plaintiff reported the repeated intrusions to Human Resources and asked for their assistance in providing a private and secure room for her to express her breast milk. Human Resources said that they would inform the Sheriff's Department of the incident and hang signage on the door to the room she was already assigned to.  Plaintiff never saw any signage added to the three (3) doors to the room she was assigned.

26.     In March and April 2020, due to the COVID-19 pandemic, the Treasurer's office closed to the public and reduced staff hours and number of days worked.

27.     In April 2020, Plaintiff was temporarily transferred to the Election Commissioner's office to assist with its election duties. Plaintiff was given a new room for pumping breast milk that had no signage or lock on the door. The first time Plaintiff used the new room to pump, another person entered while she was uncovered and pumping. Plaintiff contacted Human Resources

immediately about the issue, which resulted in her being removed from the temporary assignment with the election office before lunch that day.

28.     Plaintiff returned to the Treasurer's office, and her supervisor, Gayle Neizel, (hereinafter "Neizel") made it very clear she was upset with Plaintiff's complaint that caused the transfer back to the Treasurer's office. As a result, Neizel sent Plaintiff home for the rest of the day, and told Plaintiff that the situation would be discussed with her later.  Neizel never did discuss the situation further with Plaintiff, but instead distanced herself and avoided Plaintiff for the next several days.

29.     Upon returning to her regular job at the Treasurer's office, Plaintiff's pumping area was changed to the employee breakroom. Plaintiff was not given a reason for the change and was asked to work with her coworkers to coordinate her pumping breaks so that the breakroom would be empty when Plaintiff needed to use of the breakroom for pumping. Plaintiff was further instructed it was up to her to let her coworkers know that they needed to leave the breakroom when she was taking a pumping break. Because Plaintiff was moved to a common space, she had to take more time to clean and store her pumping equipment and prepare the breakroom so it could be open to the other employees when she wasn't using it to pump. Human Resources informed Plaintiff that they would be watching the time she used to express breast milk very closely and that she would not be given more time even though the process took longer in the new room. The only way Plaintiff could meet the 30 mins of time she was given to pump was cutting her sessions down timewise and not expressing as much milk as she needed to each session.

30.     After Plaintiff was moved to the employee breakroom, her coworkers became upset with her, expressing their frustration with the new arrangement and that it was unfair that the were not able to access the breakroom when she was using it to pump. Plaintiff felt that her work

environment became hostile on account of the move to the breakroom to pump and the pressure she felt from supervisors and coworkers not to take her pumping breaks.

31.     On May 18, 2020, the Treasurer's office opened to the public by appointment only. Customers were expected to come in at scheduled time and wait until a supervisor directed them to an open counter. Plaintiff's lead, Kim Muhleka, (hereinafter "Muhleka") told Plaintiff that she could take her first scheduled pumping break at 9:00 a.m. At that time, Plaintiff started to walk away from her station to go to break when Neizel directed a customer to Plaintiff's window. As the customer approached he asked Plaintiff, "Are you going on break?" Plaintiff responded affirmatively and the customer got back in line to wait for the next available customer service representative. Plaintiff took her pumping break as she had been instructed to by Muhleka, but when she returned to her station, she was confronted by Neizel. Neizel reprimanded Plaintiff for sending a customer away from her window, stating it was rude and unprofessional. Plaintiff apologized and told Neizel that she would not do it again. Since then, Plaintiff has delayed taking her breaks until granted permission to do so by a lead or supervisor. This has resulted in Plaintiff not getting the time she needs to pump her breastmilk at work because she feared reprisal and further discipline.

32.     Later in the day on May 18, 2020, Plaintiff's lunch break ended at 1:00 p.m. and shortly thereafter, Plaintiff was told by her supervisor that her last scheduled time to pump would be from 2:00 p.m. to 2:30 p.m. Plaintiff emailed Kristine Vickery in Human Resources about the problem with how close her breaks were that day. Plaintiff also complained that other employees were not required to obtain permission before taking a scheduled break.  Vickery's response was to "pump the first half of your lunch break to allow more time between breaks. Sometimes, due to business needs, breaks are not able to be scheduled the same way every day." Plaintiff commented

7

that if she had known the scheduling in advance, she would have been able to plan ahead like Vickery suggested, but in this case, that was not possible. Plaintiff also told Vickery that based on how breaks were done before COVID-19, breaks starting at 2 pm were generally designated for employees who had an 11 am lunch, not the 12 pm lunch break Plaintiff had that day.

33.    On May 19, 2020, Plaintiff received permission from her supervisor to close her window approximately 5 mins after her scheduled break time. After giving permission but before Plaintiff's window was closed, the supervisor sent a customer over to Plaintiff's window. Plaintiff did not feel that she could direct the customer to another open station without fear of reprisal, so Plaintiff's break was delayed, and in turn other coworkers' breaks were delayed because she was pumping in the break room, which upset several of Plaintiff's coworkers.

34.    Plaintiff was out of work ill from May 20, 2020 to May 31, 2020.  Plaintiff returned to work on June 1, 2020. When Plaintiff returned to work on June 1, 2020, she discovered that the breakroom she was assigned to use to pump breastmilk was filled with computer equipment due to construction and she did not have the space to use the room to pump breastmilk.  Plaintiff spoke with her supervisor, Neizel and nothing was done to provide her with a suitable place.  Plaintiff then contacted human resources and the equipment was moved out of the room in time for her first pumping break. After the complaint, Muhleka started being stricter about the amount of time Plaintiff took on her breaks to pump and when she was allowed to take her breaks and lunches. Plaintiff began to worry all the time about running overtime on her breaks due to pumping. Plaintiff began skipping pumping breaks in the afternoon due to the pressure that was being placed on her by her lead and supervisor.

35.    Due to the repeated issues with her breaks and her supervisors' and coworkers' resulting resentment, Plaintiff spoke to Vickery and Kerri Plummer-Gelecki in Human Resources

about the situation. They responded by stating Plaintiff must meet the needs of the customers first.
Plaintiff told them she felt as if she was being treated differently and felt pressure by both ensuring
that she did not go over the 30 minutes and the resentment she perceived from her coworkers.
Plaintiff explained that she felt these recent situations were retaliation over speaking to Human
Resources about earlier situations. They responded by stating they would follow up with Neizel
and Treasurer Zuger. Nothing improved for Plaintiff after this meeting.

36.     On June 4, 2020, Plaintiff was informed that due to construction, she would need
to bring her pumping supplies to the Human Resources building across campus and would be using
an area in that office to pump breast milk starting June 5, 2020.

37.     Upon arriving in the Human Resources building on June 5, 2020, Plaintiff
discovered that there was an uncovered window in the room she was assigned to use. When
Plaintiff noticed the window, she expressed concern to the HR representative, Kristine L/N/U, who
said "you can't see in it, just out." Trusting her, Plaintiff expressed there for another day until she
investigated the window herself and found that she could see into the room from outside of the
office. Plaintiff informed a different representative in HR, Mary Davis, who found a cover for the
window.

38.     On June 9, 2020, Plaintiff was put on a performance improvement plan (hereinafter
PIP) which stated that she was struggling with customer service, had a low level of productivity,
and poor professionalism. Plaintiff had never been written up before and in January 2020, Plaintiff
had been told at that time that her customer service and professionalism was great. In the
performance improvement plan, Plaintiff was told that her quotas were down, but neither she, nor
any co-workers ever been told there were quotas to meet. The PIP included quotas Plaintiff had to
meet every day even though other co-workers did not have quotas. Additionally, the quotas were

9

so high that Plaintiff would have had trouble meeting them if she was not expressing breastmilk. Plaintiff also explained that she was still learning processes of the new software in January and some in February, which other coworkers had learned over the two months during her maternity leave, and therefore certain transactions took longer when she was still learning new processes. Plaintiff also explained that she was given other tasks to do by supervisors besides customer transactions various times in March, April and the first half of May that would have shown reason for productivity in registrations and titles to be lower.

39.     On June 18, 2020, a coworker forwarded Plaintiff an email they had received that included the metrics for other employees in Plaintiff's job position for the month of May 2020. The metric requirement that Plaintiff was given as the equivalent of the combined total required for 4 of the 5 employees in that position for the month of May. Plaintiff was never shown metrics from January 2020 leading up to June 2020 to verify or address why they were considered "low."

40.     At the two-week follow-up to the PIP, Plaintiff was told that she focused too much on breaks and lunches instead of the task at hand.  Plaintiff explained that her breaks and lunches were necessary to pump breast milk, and how important it was for her milk production and her physical comfort to express her breast milk on a consistent basis. Plaintiff explained that she was having increased stress and pain because she was not being given consistent breaks or lunch times.

41.     On August 5, 2020, Plaintiff received a verbal warning for leaving to go on her scheduled break to pump on August 4, 2020. Allegedly there was a customer waiting to be helped when Plaintiff left, even though she got the okay to go from lead Muhleka prior to leaving. Plaintiff informed lead Brett Hodges of her need to go to break to pump, and Hodges told Plaintiff that he would finish helping the customer she had that she could start her break—nearly an hour late. Hodges, Dan Templeton, Neitzel and  Pulmer-Gelick from Human Resources were all present in

10

the meeting.

42.     On August 11, 2020, Plaintiff was taken off of the PIP, but was not moved from a Grade 6 to a Grade 7 in pay like she was supposed to.

43.     On August 14, 2020, Plaintiff received a write-up for willfully going against policy and overcharging a customer. Plaintiff denies doing this and told Human Resources that it must have been a mistake, not willful in any way. Many employees in the same position as Plaintiff make the same mistake and do not receive write-ups for it.

44.     That same day, Plaintiff was verbally scolded for not closing out her cash drawer before she left work, even though it was 4:30 p.m. and according to her approved FMLA, Plaintiff was approved to leave by 4:15pm in order to pick her son up from daycare. Moreover, the three supervisors who knew about this incident were Hodges, Neitzel and Templeton actually gave Plaintiff permission to leave that day without closing her drawer.

45.     On September 11, 2020, Plaintiff spoke to her new lead, Coli Best Hunter and asked that she be given more time to close out her drawer since Plaintiff had stayed past her FMLA time several times that week which caused her to pick up her son from daycare after they were closed. Hunter said no customers would be sent to Plaintiff's window past 3:50pm so that she could leave work by 4:15pm.

46.     On September 11, 2020, shortly after the meeting about her FMLA time with Hunter, Plaintiff was assigned to work the phones.  Plaintiff was told that all the employees were going to rotate into the position after Plaintiff in the following days and weeks, however, that did not happen. Plaintiff complained to Hunter that she would not be able to improve in her job if Plaintiff only worked the phones.

47.     On September 11, 2020, Plaintiff asked Hunter if she could take her last pumping

11

break at 3:05pm since all of the other first shift employees had already taken their afternoon breaks. Hunter told Plaintiff that she had to wait until she could find someone to take Plaintiff's place on the phones even though there have been other times when new hires were on the phones have been allowed to go on break without waiting for someone else to take their place.

48.     On September 12, 2020, Hunter sent Plaintiff another customer at 3:50pm, instead of letting her start closing the drawer. As a result, Plaintiff rushed to do the close out and was almost late picking up her son again.

49.     On September 22, 2020, during a meeting with Hunter, Plaintiff was harassed by Hunter who said that Plaintiff has attention deficit disorder and anxiety, and made a gesture with her hand to indicate she thought Plaintiff was crazy.

50.     On September 29, 2020, Hunter made a comment to me that she understood it can be hard to focus when there are "voices in your head."

51.     The week of September 28, 2020, Plaintiff received a final written warning allegedly due to a customer issuing a complaint about her when she was not even at work. There is also no proof that Plaintiff did anything wrong with this customer.

52.     On October 1, 2020, Plaintiff was placed on a second performance improvement plan (PIP). She was told that her performance during this time had improved and she was taken off of the PIP on October 27, 2020.

53.     On November 6, 2020, Plaintiff was put on administrative leave due to allegedly overcharging a customer. Plaintiff denies this allegation and was never given the proof of her error that she requested from Defendants.

54.     On November 13, 2021, Plaintiff was discharged by Sarpy County Treasurer Zuger.

55.     Plaintiff timely filed an Appeal Form with Defendant Sarpy County Personnel

Policy Board on November 23, 2020.

56.     A special hearing of the Board was scheduled for January 13, 2021, and January 28, 2021 to hear Plaintiff's grievance.

57.     In a three to one decision, the Board denied Plaintiff's Appeal of her termination.

58.     Prior to termination, Plaintiff's job performance was satisfactory.

59.     During Plaintiff's employment, the supervisors and leads have made comments about her daycare's limited hours and specifically Hunter keeps asking when Plaintiff's daycare will be operating at normal hours. Plaintiff explained that the restrictive hours are due to COVID-19 and her FMLA time covers the time she leaves early every day. Plaintiff's coworkers were able to go to any of the leads in order to ask questions regarding customers, but Plaintiff was limited to Hunter as a primary, Hodges or Neitzel if Hunter was unavailable, and Plaintiff was not allowed to speak to Muhleka who was her lead previously.  Supervisors also seemed as if they were watching Plaintiff more closely in order to write her up so that she could be terminated.

60.     At the time of her termination, Plaintiff was earning approximately $592.71 weekly, working fulltime hours for Defendant. As of the date of this filing, Plaintiff's lost wages resulting from Defendant's wrongful conduct are approximately $35,000 and are continuing. As part of her compensation, Plaintiff also received health insurance, retirement contributions, and other employee benefits in amount currently unknown to Plaintiff and will be subject to further discovery.

61.     As a result of Defendant's wrongful conduct, Plaintiff suffered lost wages, compensatory damages, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and has also incurred attorney's fees and other costs that are continuing.

## COUNT I

## TITLE VII PREGNANCY DISCRIMINATION

62.     Plaintiff hereby incorporates paragraphs 1 through 61 as if fully set forth herein.

63.     Defendant discriminated against Plaintiff with respect to the terms and conditions of her employment based on her pregnancy and sex, in violation of Title VII.

64.     Defendant refused to accommodate Plaintiff's pumping of breastmilk for her child and treated Plaintiff differently from non-pregnant coworkers based on her pregnancy.

65.     As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to mental and emotional distress; anguish; humiliation; embarrassment; medical, therapeutic, and other expenses; lost enjoyment of life; lost wages; benefits; and other emoluments of employment.

## COUNT II

## STATE LAW PREGNANCY DISCRIMINATION

### Neb. Rev. Stat. §48-1104

66.     Plaintiff hereby incorporates paragraphs 1 through 65 as if fully set forth herein.

67.     Defendant discriminated against Plaintiff with respect to the terms and conditions of her employment based on her pregnancy and sex, in violation of the Nebraska Fair Employment Practices Act.

68.     Defendant refused to accommodate Plaintiff's pumping of breastmilk for her child in direct violation of state law and treated Plaintiff differently from non-pregnant coworkers based on her pregnancy.

69.     As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to mental and emotional distress; anguish;

humiliation; embarrassment; medical, therapeutic, and other expenses; lost enjoyment of life; lost wages; benefits; and other emoluments of employment.

## COUNTS III & IV

### RETALIATION

### 42 U.S.C. § 2000e-3 and Neb. Rev. Stat. §48-1114(1)(a) and (b)

70.     Plaintiff hereby incorporates paragraphs 1 through 69 as if fully set forth herein and states:

71.     During her employment, Plaintiff engaged in protected activity, including but not limited to exercising her rights under Title VII and the NEFEPA by seeking an accommodation and internally complaining about pregnancy discrimination and retaliation to Human Resources.

72.     Defendant took adverse employment action against Plaintiff, including but not limited to subjecting her to harassment, a retaliatory hostile work environment, including but not limited to intimidation and damage to public reputation, negative performance evaluations that effect Plaintiff earning merit raises in her pay and promotions and disciplinary actions.

73.     There is a causal connection between Plaintiff's participation in protected activity and Defendant's adverse action against her.

74.     As a result of Defendant's retaliation, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and other emoluments of employment.

## COUNTS V & VI

### VIOLATIONS OF THE FAMILY MEDICAL LEAVE ACT

### (Interference and Retaliation)

**29  U.S.C. 2601 et seq.**

75.     Plaintiff hereby incorporates paragraphs 1 through 74 as if fully set forth herein and states:

76.     Defendant is and was at all times material an "employer" within the meaning of the Family Medical Leave Act.

77.     Plaintiff is and was at all times material an "eligible employee" within the meaning of the Family Medical Leave Act.

78.     During her employment with Defendant, Plaintiff needed time off from work to care for her newborn child within the meaning of the Family Medical Leave Act.

79.     Plaintiff was entitled to block and intermittent leave of absences during her employment pursuant to her rights under the Family Medical Leave Act.

80.     Plaintiff invoked her right to a leave of absence under the Family Medical Leave Act.

81.     Defendant interfered with, restrained and/or denied the exercise or the attempt to exercise Plaintiff's rights in violation of Family Medical Leave Act.

82.     Defendant retaliated against Plaintiff for exercising her rights under the Family Medical Leave Act, including but not limited to discipling and terminating her employment.

83.     As a result of Defendant's acts and omissions, Plaintiff has in the past, and will in the future, suffer damages including, but not limited to, lost wages, benefits, future earnings, liquidated damages and other emoluments of employment.

## **DAMAGES**

84.     Plaintiff hereby incorporates by reference paragraphs 1 through 83 and states:

85.     As a result of Defendants' discrimination and retaliation, Plaintiff has suffered

damages and seeks the following relief:

    a. Back pay and lost benefits to the time of trial;

    b. Front pay including retirement and other benefits;

    c. Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

    d. Liquidated damages under the FMLA;

    e. Punitive damages for Defendants' actual malice or reckless indifference to Plaintiff's federally protected rights;

    f. Attorney's fees, expert witness fees and other reasonable costs; and,

    g. Pre-judgment and post judgment interest.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for all her general, special, and punitive damages, for costs, attorney's fees, interest and for such other relief as just and equitable. Plaintiff demands a trial by jury.

Dated: November 29, 2021.

MEGAN STANEK, Petitioner

BY:   s/ Jennifer Turco Meyer
       Jennifer Turco Meyer #23760
       Of Dyer Law, P.C., LLO
       2611 S. 117th Street
       Omaha, Nebraska 68144
       (402) 393-7529
       (402) 391-2289 facsimile
       Jennifer@dyerlaw.com
       Attorney for Petitioner